You may proceed. May it please the Court, Scott Crowell on behalf of the Redding Rancheria. I'd like to reserve five minutes for rebuttal if possible. The District Court erred in finding the Department of Interior acted within its discretion to promulgate and apply a rule that a tribe restored to federal status may not take lands in a trust for gaming purposes under IGRES or the Indian Gaming Regulatory Act's restored land provision if it is already gaming on existing eligible lands. It is the exclusive province of Congress to diminish Indian rights. It is not the province of the Department of the Interior. This is administrative legislation, and as such, the narrow portion of the Part 292 regulations needs to be struck down. The relevant portion of the Indian Gaming Regulatory Act reads, IGRES restriction on gaming on lands acquired after 1988 will not apply when lands are taken in a trust as part of the restoration of lands for an Indian tribe that is restored to federal recognized or restored to federal recognition. Yet the Department, in effect, amends that provision to add unless the tribe is operating a gaming facility on other eligible lands. Let me ask you this, though. While you're challenging the present action, are any regulatory restrictions allowable under IGRES to limit the number of restored lands that a tribe can utilize for gaming purposes? We don't dispute that the Department of the Interior has the authority to issue interpretive regulations regarding the implementation of the Indian Gaming Regulatory Act. We don't dispute the bulk of the Part 292 regulations that are at issue in this litigation. For 14 years, the courts dealt with this specific provision. Well, but did Congress intend for restored tribes to be able to establish gaming operations on an unlimited number of restored lands? On an unlimited number of restored lands? Yes. Theoretically, not realistically, but so long as those lands are part of that tribe's restoration land base agenda. What the courts dealt with and what the bulk of Part 292 deals with is that there are parameters on when a tribe is in the process of dealing with restoring its land base after it had been wrongfully terminated and restored to status. That's why you have the modern nexus that's required by the rules, the historic nexus, and the temporal nexus. What's pulled out of thin air that has no basis in the case law or no basis in the history of the Indian Gaming Regulatory Act is this numeric restriction that says you can't game on restored lands if you already have a gaming facility in place. And it's particularly heinous here where the facts are that the tribe isn't looking to create multiple, it isn't a McDonald's chain. They want to relocate their existing. Well, I understand that, that this tribe says that it's going to get rid of its other gaming facility and build one on this restored land, newly restored land. I do understand that. But you're asking us to strike down the entire regulation that, that's what you just said, that said to the extent that it says that you can't build a casino on newly restored land if you're already operating a casino, if you're a restored tribe. So you're asking us to strike this down in its entirety is what you said. Well, we're asking you to strike the language, quote, and the tribe is not gaming on other lands as you find that in 25 CFR 292.12c2. Right. So they can build a casino even though they have a casino already. Correct. And that would be true for all tribes who want to build restored tribes on newly restored land. Well, that's correct. And as the United States concedes, that's also true for every other tribe in terms of the number of facilities they can have. We put into the record. Well, okay, but I guess going back historically, what, in 1922, the tribe had about, what, 30-something acres. Is that correct? Correct. All right. And now and then the present gaming is on about how many acres? I'm not sure of the exact acreage, but it's within that original 30-acre. Right. And so now they want to do 150-acre complex with, I think, an additional 80 acres for parking or something like that. So the government's position is it's expansion as opposed to restoration, right? I don't think that they've articulated that, and if they did, that wouldn't be an appropriate interpretation because for all of those years that the tribe was wrongfully terminated, it was deprived of the ability to take advantage that every other tribe that wasn't wrongfully terminated did, in fact, do, which was expand their land base and put in fee-to-trust applications to be able to have a larger land base on which to provide services to the members and which to provide economic development. So when they did the original gambling casino, if they had restored lands at that time of 150 acres, they could have done it that way, right? But now they just can't later because they're already gaming on the 30 acres to go move over to the 150, right? Right. And every other tribe that wasn't a restored tribe would be able to do both. So there is, for tribes that were already recognized at the time of the adoption of IGRA, I mean, they're – and I'm talking about lands that they – tribal land that they already had at that time. There's no – there is no numeric limitation that applies to them. Is that correct? That's correct. That's correct. And, in fact, you know, there are tribes – Chickasaw and Cherokee in Oklahoma, I believe, have, you know, 15-plus each. The Lac du Flambeau tribe and – So isn't that the – excuse me for interrupting, but that's sort of the essential unfairness that you see in the application of this numeric limitation to the restored tribes. Is that correct? Well, that's certainly one aspect of the unfairness. Part of it. The core unfairness is that the tribe, when it – when you're restored to federal status and you're now looking at this overwhelming obligation of your membership in terms of getting yourself back up and running as a tribal government, and you're very limited in resources, you look at the rules and you lay out an agenda, just like the Reddy Rancheria did in terms of its own restored lands agenda. Now, you know, the intuitive part is that you need to generate the resources to be able to go out and acquire lands. So it's logical. And in many situations, the only likely available means for those resources is the game on lands over which you're currently exercising, over which you have jurisdiction. And the Reddy Rancheria did that here. And then the Reddy Rancheria said, well, we've got a Head Start program and a cemetery that we'd like to have taken into trust. And so they went forward and did that. And then they went forward to acquire this land for economic development, the Strawberry Fields land. And under the rules at the time, there was no indication that they would be precluded from doing that simply because they have exercised their right to game on lands over which they have jurisdiction, or that they would be precluded from doing that because they had already taken their Head Start program and their cemetery, you know, into trust into prior applications. It was not until the final rule was published that there was ever even any suggestion from the Department of Interior that such a rule would be in place. It was not even in the proposed rules that were under consideration for five years. So the change of the rules is the fundamental unfairness that we believe applies in this case, even if Chevron deference is applied. Of course, we argue in the briefs that we don't believe Chevron deference should apply. Kagan. Could you explain that again, because I'm not sure that I understood this clearly from the briefs, that there is some unfairness involved in the prior dealings with this tribe that makes this regulation inapplicable? The unfairness is that this tribe set out on its restored land agenda, playing by the rules as they were laid out and as they were understood. The Department of Interior has taken land into trust under the restored lands provision for other tribes that have gaming operations. The Sixth Circuit has affirmed a decision in favor of a tribe that it could game on lands under the restored lands exception where it had preexisting gaming operations. There was no reason to believe that this wasn't the case. When you look at what the tribe did, it relied upon the rules that were in place. When it did what? When it laid out its initial restoration of its land base. When it made the decision that it was going to game on the lands within its existing region. When it made the decision that it was going to put the Head Start and cemetery into trust. But, well, I guess, but you're, I'm hearing implicit in this, some of the disadvantage to you is that some tribes were richer than you were and they put things into, they had more restored lands at that time, right? It wasn't a question of even being richer. I don't know of any tribe that was wrongfully restored and then at the time of restoration had unlimited funds to pursue some agenda. So, but you're saying it became unfair because later when the rules changed, they didn't change them after they already had gaming on strawberry fields. It just, they put this regulation out and then it prevented them from gaming there, right? Right. But you have to. So if it, but, so it's, I mean, how can you exist and say that you're detrimentally relying on that there will never be anything that will restrict your use of the land? Well, it's not that, it's not, there's obviously a certain, you know, ambiguity as to what's going to occur in the future. But at the time that they made their decisions, there were rules that were in effect. There were case law that was in effect. And they abided by those rules. And they abided by that case law. Well, so what's the violation of that? These regulations were promulgated by the Department of the Interior through notice and comment rulemaking. So what's the violation here that would prevent Chevron deference from applying? Well, on several levels. First, there was no notice and comment rulemaking as to this particular language. It did not exist in the proposed rules. It did not show up until the final rule was published. So there was no notice and comment opportunity available to the Redding Rancheria or any tribe to comment on the particular provision that is at issue here. And I would suggest that even if Chevron does apply, that that factor means that there should be less deference. We also cite the case law that says when you're dealing with a change in rules, you have to provide an explanation. At least admit that you're aware that you're making a change in the rules. And when there's not that explanation and there is that change, there should be less deference. There's also the case law that says when you're doing something that's contrary to the case law that had been decided, that there should be less deference. Even so far in situations as you have here, where the Sixth Circuit had ruled that the Grand Traverse Tribe, having an existing gaming operation, was still able to game on land taken in to trust under the restored lands exception, provides a stare decisis barrier for the department to go forward. Even under Chevron, you still have to have a permissible construction of the statute. It has to be in light of the language, the plain language of the provision and the context of the act. It has to be in light of the case law and in light of the prior action. We argue that under even if Chevron does apply, they don't provide that permissible statute. Your argument, I think your primary argument is that there's a plain meaning problem for the government here. Isn't that correct? And if that's so, I'd like you to explain a little more for me if you could. Because you started out by saying you acknowledge that the government was entitled to adopt regulations that provided some content to this concept of restoration of lands, that regulations that deal with the temporal limitations, historical relationship between the land that would be acquired and the status of the Indian lands before perhaps the modern requirement, I guess. So what, and yet having acknowledged that, why is this numeric limitation contrary to the plain meaning of that language, restoration of lands? Why does that go too far in terms of plain meaning? Well, the plain meaning of the language that is at issue is the restoration of lands for an Indian tribe that is restored to Federal recognition. We believe that there's nothing in the plain meaning of that term to suggest that a tribe's agenda to restore its land base ends when gaming begins. The case law that says, most of the case law said those terms aren't even ambiguous. Two cases dealing with an Oregon tribe said, well, yes, it is ambiguous. And that would be the trigger, if you agreed with that, to be able to go in and have Chevron deference. But when you look at the case law, none of the case law suggested, oh, and it matters whether you have an existing gaming facility or not. The case law says there have to be these parameters. If you're going for something where you don't have an ancestral nexus or you don't have a temporal nexus, then it's not restored. It's not part of your agenda to restore your land base. And with those, we have no objection. In fact, the Department found that the tribe met those criteria, which do have their basis in the case law that was developed during the years prior to the promulgation of the regulations. Would you like to save some time? I only have four minutes left, so I'd like to save some time. Okay. Thank you. Thank you. Good morning. May it please the Court. My name is Lane McFadden. I represent the United States. The Secretary's interpretation of Igres Section 20 was not just permissible, but a reasonable one. The Secretary explains in the preamble to the Part 292 regulations that the temporal connection we're discussing here today, quote, effectuates Igres' balancing of the gaming interests of nearby tribes and the surrounding community. That's at page 29,367. Well, it seems to me that Appellant's counsel seems to indicate that this rule that ultimately came up was like a total surprise and that no one had an opportunity to comment on that. Can you enlighten me from your perspective what happened during the comment period of the proposed rule? Were any comments submitted? And is do you agree with his recitation of that this was a total shock at the end and they had no time to comment? I do not agree with either of those, Your Honor. And I'll address the comment process first. And then I think there's maybe some misunderstanding about the sequence of events in this particular case. The draft regulations were published in 2006 after a consultation process with interested tribal parties prior to the development of those drafts. And the regulatory is correct that this particular clause of 292.12c was not in the original draft regulations. It was proposed by commenters. I have one example in front of me at AR 1727. I apologize. That's not in the excerpts. Which proposed the addition of this language. And then it was promulgated in the final regulations in 2008, along with some other changes in response to comments, most of which focused on the mileage radii that were in the historical and modern connection issues. There was a lot of comment about the extent to which you reach out geographically to draw in affected communities and nearby tribes and how far out you go from the proposed restored lands to take comments and have those people involved in the process. That was the focus of a lot of the comments and a lot of the development of the regulations. So those regulations were put forth in May 2008. And then it was in June 2008 that the Redding Rancheria came to the BIA with a complete fee-to-trust application for its Head Start facility and for its tribal barrier grounds. So it is not the case that they had requested those lands be taken into trust and then were caught unawares, were sandbagged, if you will, by these regulations. It occurred the other way around. And then that was June 2008. They asked the Department of the Interior to take into trust lands for non-gaming purposes. And then in December of 2008, the tribe finally submitted all of the documents that had been requested back in 2006 to support its request to take in strawberry fields, to take strawberry fields into trust for gaming. They had originally asked for that several years prior, and the Department wrote back in 2006 and said, well, we're going to need deeds, a statement of purpose, a number of other exhibits. And those were provided later. So if they had completed it in 2006, would they have been able to game on strawberry fields? It's very likely. It would have been the first, as far as I'm aware of, it would have been the first lands taken into trust after their first newly acquired lands taken into trust after their restoration, if I'm not mistaken about that. They had filed previous applications for parcels that were, I believe, the parking lots adjacent to their current gaming facility. So is the answer yes, if they had done it in 2006? Yes. Okay. And then the process was ongoing. The Interior had before it these applications, and then before it was able to respond to the strawberry fields application, they submitted another request in 2009 for tribal administration building. This is all after the final regulations are promulgated, and everyone understands the clear and predictable rules that are set forth in 292.12c. It's simply not the case that they can claim to have been taken surprise by these regulations because their requests were submitted after the regulations were finalized and published in the Federal Register. They point to the Elk Valley decision, which is also discussed considerably in the briefs.  And they say, well, that would have come up differently under the regulations. That's what we were looking at. But Elk Valley, in particular, was a 292.12c.1 application, which is where that tribe bundled its request for lands taken into trust for gaming with a single initial request for lands taken into trust for a number of requests, and the Secretary of the Interior granted that request ultimately and permitted them to gamble. So the and is not gaming on other lands language didn't apply in that case and was not applied. Obviously, the regulations weren't promulgated, but that consideration did not come into play. So can the 2008 regulations be reconciled with the previous administrative decisions issued by the Secretary, such as Elk Valley Venturia? Yes, Your Honor. I mean, for the reason I just stated, Elk Valley itself is specifically consistent with 292.12c.1. 292.12c.2 was developed in response to a number of comments complaining that the modern and historical connection tests were broad and permissive and were a change from the initial views of the Secretary of the Interior right after Igor's promulgation, which was that restoration is a single event triggered by a congressional act or administrative decree. Obviously, that change, that view has evolved considerably in the subsequent years, and these regulations codify that evolved view in a way that sets forth the rules and no longer requires Interior to apply these in a totally discretionary and case-by-case basis. Counsel, this numeric limitation, in all candor, to me it has the ring of a policy judgment rather than an exercise in language. It's a policy judgment that if you already have a gaming facility, you're not entitled to a second one, and I'm trying to understand how that policy judgment has any grounding in the language of IGRA itself, which does circumscribe the authority of the Secretary to adopt these regulations. I just don't know what that has to do with the concept of restoration of lands. I can understand how some of the other regulations involving modernity, temporality, that has something to do with the concept of restoration of land, but I don't understand what this numeric limitation has to do with that language and that concept of restoration of lands at all. Well, Your Honor, this question has several parts. Initially, I would say we don't use the phrase numeric limitation precisely because there are a number of ways. That's what it is. There are a number of avenues by which the Reading Rancheria could have multiple casinos. It is not the case that it limits them to a specific number. It is in their particular circumstance limiting them right now. But that's a different – that is different than saying that is the concrete policy of the regulation as promulgated. The reason that the temporal connection does contain some limitation is because the restoration of lands is, in fact, a process that is in the context of gaming. It is a statutory provision in the Indian Game Regulatory Act. It exists solely for the purpose of establishing when Indian lands are eligible for gaming, and we are not talking about restoration for other non-gaming purposes. I mean, 2719B1B3 is about when lands are eligible for gaming, and it is about that alone. And so it is in that context that the Secretary has interpreted what can be considered the part of the restoration of lands for a tribe restored to federal recognition. Well, the underlying purpose of the Act is to promote economic self-sufficiency, economic development for the tribes. And this numeric limitation on its face seems contrary to that underlying purpose. Well, that is one of the stated purposes of the statute, and that is why the restored lands exception exists, because otherwise these tribes would be subject to the restriction on gaming after 1988, and they'd have no lands on which they could game. But this is – this particular regulation is an interpretation of that exception. It is a limited exception to the broad rule that applies to the vast majority of Indian country, which says that only lands held in 1988 may be eligible for Indian gaming. Well, let me ask you this. Let me make sure I understand this. The Act, as you just said, prohibits the construction of casinos on land acquired after 1988. The restored lands is an exception to that prohibition. Is that correct? That's correct. And the regulations try to define, explain what restored lands means. And so they say, the regs say that there has to be a connection of the tribe to the newly acquired lands. And so I guess, as I understand it, the key provision is that it has to be either included in the first request, is that correct, for newly acquired lands after restoration, which this tribe doesn't qualify for because it did, as we went through before, it had a prior one, or the application is made within 25 years, which this does qualify, and the tribe is not gaming on other lands. That's correct. Now, can you explain to me what the abuse is that that qualification, that they're not gaming on other lands, is trying to prevent? I don't know that I would use the word abuse. The concern was that you have an exception that applies to a small number of tribes as compared to the number of tribes subject to the prohibition. Obviously, the exception needs to be applicable in a way that permits them to benefit from gaming, as ABRA provides. But you obviously have to have some constraint on that of some sort, or else the exception swallows the rule and there would be a number of tribes eligible to acquire land ad infinitum, and so obviously that was not of the intention of Congress, and that was not in the view of Interior. That would disadvantage tribes that do not have that opportunity. And so the goal of 292.12c, which, as Your Honor pointed out, is an either-or that are different avenues for qualifying the temporal connection, is to cabin that some way, to say that the process of restoration in general will probably take about 25 years. If it doesn't, if it takes longer, you can still game, but you do it on the first land that you acquired after that more than 25-year process. And if you're benefiting from IGRA already within the 25 years, then you've already benefited from the exception in the view of the Secretary's regulation, and you proceed to ask for a secretarial determination. I guess I'm just not quite understanding what you're trying to, what interest you're trying to serve by this. Well, the Secretary, as stated in the preamble, had to consider the interest of restored tribes, interests of non-restored tribes who do not qualify for the exception, and the interests of States and local communities, many who came out vociferously against the proposed regulations, because in their view they would permit a lot more gaming than had been permitted before. All of these interests are balanced in the creation and promulgation of these regulations. So you just have to show what you did is reasonable. They would have to show that it's arbitrary and capricious? That's correct, Your Honor. So what, I guess what I am trying to understand here in that, so some of the factors in terms of if, say, if Redding Rancheria were to be able to do more, there would be other people that don't qualify for the exception at all. Or allowing them to do more also affects the surrounding communities as to how many of these, how many casinos are going to exist. And you said that there are a number of people that are against having a lot of casinos, but it also, the purpose is to allow, you know, financial independence and all of that. So you're just, are you just saying, okay, you can point out some people aren't going to be happy here, some people aren't going to be happy here, but you're making a reasoned judgment in how you approach this? That's exactly right, Your Honor. This is a reasoned interpretation. It tries to balance a number of competing interests. It does so by setting forth a clear and predictable rule for the application of this provision. A suggestion that the process of restoration of lands is unambiguous is incorrect. I mean, the courts have said that it was clear that the statute does not mean solely by congressional decree. That interpretation was rejected. But what does constitute the process for restoration once it is admitted to be a process that encompasses many events over many years is ambiguous. And this is the Secretary's interpretation, an attempt to establish precisely what does and does not qualify. Okay. What, when this tribe got its first request for land, which is, I gather, when the cemetery and the school and what, what their argument is that they were relying on being able to make another one. And so, therefore, applying this regulation to them is unfair. What is your response to that? Well, just to clarify factually, there were some other lands taken into trust within the initial reservation earlier, back in 1992, before anyone was ever thinking about Strawberry Fields. I mean, there has been a number of limitations. But this was their first newly acquired lands, as understood under the regulations. And the idea that it's an arbitrary and capricious application to them because they feel that they should be able to qualify both under 2719a1 and 2719b1b3 simply doesn't have any support in the text of the statute. The statute, this idea of exceptions and exemptions doesn't have any statutory basis. Exemptions isn't in the statute. There are a number of exceptions which may or may not apply, either one or all or none, to any given tribe under which the general prohibition doesn't apply. And they're gaming now currently under 2719a1. That exception does apply to their current gaming facility. But 2719b1b3 doesn't. That's a very little facility, and they want to build a bigger one, and they say they're going to tear it down. Well, they did say that some six days before the final decision. But the regulations don't provide for that conditional sort of approval. Let me just say, let's just go hypothetically. Let's say that you said it only applies after you have two gaming operations, you know, that if you're gaming on two properties, then you don't get to expand. Now, if, let's say if that were your judgment and you were balancing everything and homeowner, you know, some group in a city came in and said, well, you know, we don't want this many casinos, would you still be reasonable and not arbitrary and capricious as to those people? I mean, can you be reasonable? There are, I mean, yes. There are, in the abstract, a range of reasonable interpretations of ambiguous statutory language. And this falls within that range, to be sure. Maybe two would be also reasonable. You'd have to ask whether that's overly broad. Maybe the modern connection would be shrunk in response to having two instead of one. And see, they're all interconnected. And it's a mistake to look at this one clause in isolation. The judgment is. Well, I'm just trying to. So you could make, you're saying there could be a range of reasonable. And so when we look at it, you just have to be in the range, not be in our. And that's how the Chevron deference works. Yes, Your Honor. But in the Ninth Circuit, there's some arguments here that whether the Indian canon and Chevron deference, which one wins. Is there any dispute in the Ninth Circuit? No, Your Honor. The case law is quite clear that when the interpretation advanced before the court is advanced by a Federal agency that administers that statute, then this Court defers to that interpretation. The Indian canon applies in other situations where the other party is a State or non-Indian party, but not the Federal government advancing and otherwise deferred to regulation. This Court noted in a footnote in Navajo Nation that there were other circuits that have gone the other way, but there was no reason to resolve that in that case. And I would like to point to the Supreme Court's opinion in Chickasaw Nation v. United States, the 2001 opinion cited in the opening brief, where that Court said, quote, Canons are not mandatory rules. They are guidelines that need not be conclusive. And that is perfectly consistent with this Court's case law beginning in Shields, which said that the Indian canon is, too, a guideline. It's an important principle of statutory construction, but in some circumstances, which is the, frankly, uncommon circumstance we have here today, where the interpretation advanced by some Indian interests is advanced against an interpretation presented by the Federal agency that has promulgated regulations that are due Chevron deference, then in that case Chevron deference applies. And just a codicil to that, the argument that this particular clause, the and is not gaming on other lands language, must be stricken because there wasn't an opportunity to comment on that clause, is advanced for the first time this morning in this litigation and is not one, I think, that merits response. But I will say that it was discussed in the comments of the page I submitted, and if the Court has questions, I can point to other parts of the record where, during the comment process, this was given some consideration. Roberts. I'll be brief. Counsel, for tribes that were recognized and that had tribal lands at the time that IGRA was adopted, there is no numeric limitation with respect to them. I mean, they could arguably create as many casinos as they wished to, as might be financially viable on those tribal lands. Subject to a lot of other legal restrictions, yes. They can do that. Okay. And so one of the purposes of the exception we're discussing here was to preclude those tribes not recognized at the time that IGRA was adopted from being disadvantaged. How do you reconcile that with imposing a numerical limitation on tribes that get recognition after the adoption of IGRA with the absence of any such limitation on those tribes that were already in place and had tribal lands at the time that IGRA was adopted? Well, there are a couple of ways. One is that restored tribes can game within their existing or initial reservation, and they can also qualify to game on newly acquired lands outside of the boundaries of that reservation, which is a unique circumstance for the restored tribes, one not offered to other tribes. So in that way, if they do it in the right sequence, they can game multiple ways. There's also what is known as a two-part determination, which many tribes have done so successfully, including three in California that I'm aware of, which would be outside of this process. There's a different process by which they could game on Indian lands, not subject to any of the restrictions we're talking about today. So, again, there are a number of means by which the Redding Rancheria and other restored tribes could legally operate multiple gaming facilities. They are not restricted to one or two across the board. What was the chronology here is still a little mysterious. What was the status of this regulation at the time they made their first request for land? They made their first request, well, honestly, we don't know in the administrative record exactly when they had submitted, but around the time or slightly before the draft regs were initially proposed, they'd made their strawberry fields request. Interior responded to say, thank you, but we're going to need a lot more information. Then a couple of years passed. The final regulations were promulgated. Then the Rancheria asked the BIA to take into trust other non-gaming lands, Head Start and the Tribal Burial Grounds. Then after that, again, after the regulations had been promulgated, finally they submitted their final application for strawberry fields for gaming. Then it was another year and a half before they amended it to include the adjacent 80 acres. So that's only part of the timeline. I hope that answers your question. Your overtime and there are no additional questions. Thank you. Thank you. I want to spend a few moments on Chevron deference versus the Indian canon, but first I want to be clear with this Court. The original proposed rules were published in the Federal Register on September 14, 2000. Nothing in those proposed rules suggested a numeric restriction on the number of gaming facilities that a restored tribe was operating. That comment period was extended twice, and in October of 2006, they provided another set of proposed regulations for notice and comment. Nothing in there suggested any numeric restriction on the number of gaming facilities. It was only until the final rule was published in the Federal Register that the numeric restriction raised its head. And that was? That was in May of 2008. May of 2008. And this tribe's request for the cemetery and the school or whatever it was, that was made when? I believe in 2006. Well, no, I believe the original one, the origin of the cemetery and school was even before that. Before that. Yeah. And the original one for this, for Strawberry Fields was in 2006. Correct. Correct. And then before that, there were on reservation or within the original reservation feeder trust applications. The second point that I want to be clear about in terms of rebuttal is when you look at the numeric restriction, I think this Court did the same thing we did, is saying, well, then they must have some policy belief that you need to restrict restored tribes to only one gaming facility. But that's not their testimony, nor is it in their briefs. They say, well, and even you could have avoided this if you had known that you were going to be restricted by a prior application and not made that prior application and gamed on your restored lands first and then pursued applications under other exceptions. I think that belies the point that there's no basis, no reason on which they can rely. They talk about, well, in the preamble of the rules promulgated in 2008, that the secretary talked about the need for a temporal restriction, but there's nothing in that that justifies or explains or even provides some kind of basis for the numeric restriction. It provides a basis for the temporal restriction, the temporal restriction to which we do not object. As you sit here today, you have now had six years of Federal Register comments on proposed rules. It's not anywhere in their explanation for the rules. It's not anywhere in the brief. The only thing they really do in the brief is say, well, you know, you can avoid the numeric restriction if you were to game on your restored lands first. You know, the detrimental reliance that we're talking about goes to the original decisions the tribe made in terms of how it was going to proceed. It could have said, it could have, if it knew what these rules were going to be, it could have decided that it was never going to game within its original reservation or it could have decided that it was going to bundle everything together in terms of one application. It had no reason to know that because the rules and the policy that were in time at the place clearly allowed for the tribe to do that without foreclosing its ability to game or submit an application for gaming at a later point in time. Now ---- Kagan. Was this argument made to the district court? Waxman. I'm sorry? Was this argument made to the district court? And what's the district court rule on it? Waxman. The district court simply said it doesn't need to look at whether the tribe relied upon the prior rules because it needs to only under Chevron deference find that the department's provision is reasonable or permissible. If this court, I don't want to walk away from this. Kagan. You're in overtime, so go ahead and wrap up, please. Waxman. If this court is inclined to believe that Williams v. Babbitt precludes the correct judgment here because of this argument that Chevron trumps Blackfeet, and we believe that the Supreme Court case is clear that the Indian canon prevails and that's what the court should follow. But if that's the case, then we ask this court to write an opinion that makes it clear that that doctrine should be up for en banc review. This court has twice indicated that that decision is suspect. Kagan. All right, thank you. Thank you both for your argument in this matter. I believe that I can speak for the panel, that you both did an excellent job arguing your respective positions, and this is a difficult case, and we appreciate both of your arguments. This matter will stand submitted.
judges: Schroeder, Lipez, Callahan